**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 24, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

JEFF M. HENDERSON,

        Defendant - Appellant.

No. 11-5164
(D.C. No. 4:10-CR-00117-BDB-1)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **BALDOCK**, **O'BRIEN**, Circuit Judges, and **SKAVDAHL**, District Judge.[**]

Jeff Henderson, a former police officer in the Tulsa, Oklahoma, Police

Department, appeals from his convictions on six counts of perjury and two counts of

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

[**] Honorable Scott W. Skavdahl, United States District Court Judge, District of Wyoming, sitting by designation.

violating civil rights. He claims: (1) prosecutorial misconduct; (2) erroneous admission of expert rebuttal testimony; (3) failure to investigate alleged juror misconduct; and (4) failure to acknowledge juror mistake.[1] We affirm.

## BACKGROUND

Henderson and his partner, William Yelton, were charged in a 62-count Superseding Indictment, including counts relating to drugs, deprivation of civil rights, perjury, and witness tampering. By the time of trial, 54 counts remained. The judge dismissed one count and the jury acquitted Henderson of 45 counts; he was convicted of the eight counts enumerated above. The convictions were based on two cases in which he authored the probable cause affidavit for a search warrant—the (Ronald) Crawford case and the (Carah) Bartel/(William "Eli") Kinnard case.

### A.   Bartel/Kinnard Search Warrant (Count 39)

Count 39 involved the truthfulness of Henderson's affidavit in support of a request for a warrant to search the apartment of Carah Bartel and her boyfriend, William Kinnard.[2] The issue at Henderson's trial was whether, as Henderson maintained, he

---

[1] Henderson also raises cumulative error. Because we find no error in the trial proceedings or the denial of Henderson's motion for a new trial, we need not consider his claim of cumulative error. *See United States v. Rivera*, 900 F.2d 1462, 1470-71 (10th Cir. 1990).

[2] When officers executed the warrant, they recovered 99 Ecstasy pills; 25 Xanax pills; and a little over 500 grams of marijuana. Bartel was charged in state court with possession with intent to distribute a controlled substance and pled no contest to the charges. Kinnard was also charged in state court, but those charges were ultimately dismissed.

received incriminating information from Rochelle Martin, his long-time connection for confidential information, regarding possible drug dealing. The affidavit stated:

> The [reliable confidential informant] RCI has in the past given information to your affiant and other law enforcement agencies in excess of one hundred occasions. All subjects arrested subsequent to information received from this RCI have been successfully charged with narcotic violations. Your affiant further states that the information that the RCI [has previously given] has never been untrue or misleading. The information the RCI has provided in the past has been up to date and vital on several narcotics investigations. Your affiant further states that the RCI has shown knowledge of the trafficking of narcotics.

> Your affiant further states that in the past 72 hours the mentioned RCI has been to the above described apartment and observed a white female identified as Carah Bartel and a black male known to the RCI as William Kinnard Jr., who were selling . . . MDMA or "Ecstasy" out of this apartment. . . . The RCI told your affiant that the MDMA or Ecstasy was packaged for sale and distribution. The RCI told your affiant that the RCI has observed both defendants conduct drug transactions from this apartment within the last 72 hours. . . .

(Appellant's App'x Vol. 9 at 1632-33.) The warrant was executed on February 12, 2008.

The government contended Henderson lied when he identified the RCI as Rochelle Martin. It maintained Amity Bruce, a friend of Bartel's and a newcomer to the ranks of informants, was the real source of the information referred to in the affidavit. According to the government, Henderson deliberately misrepresented Bruce's background and the statements she supposedly made to him.

When called to testify, Bruce spoke about how she came to work with Henderson and about her involvement in the Bartel/Kinnard case. She was introduced to Henderson in early 2008, after her boyfriend, Thomas Neal, pled guilty to federal drug charges; a federal agent, working with Tulsa police officers, made the introduction. Bruce agreed to

- 3 -

provide assistance to law enforcement personnel in an effort to reduce Neal's sentence. She told Henderson she knew an individual, Kinnard, who dated her friend, Bartel. Bruce believed Kinnard was selling marijuana and Ecstasy. Henderson asked if she "could possibly do a buy" from Kinnard. (Appellant's App'x Vol. 1 at 129.) Bruce agreed.

Shortly thereafter, she sent Henderson a text message stating Kinnard had pills available for her purchase. Henderson advised her to "go and do the purchase." (*Id*. at 130.) According to Bruce, she bought an Ecstasy pill from Kinnard while Bartel was in the other room. After the purchase, Bruce informed Henderson she made the buy. Henderson instructed her to "get rid of" the Ecstasy pill. (*Id*. at 133.)

After Bruce learned the search warrant had been executed, she asked Henderson if she would have to testify or if Bartel would ever know she was the source behind the search warrant. Henderson replied "it would never be found out." (*Id*. at 134.) Contrary to Henderson's statements in the affidavit, Bruce had never given information to law enforcement agencies before, had never been part of a successful drug investigation, and had no knowledge of narcotics trafficking. She had never shown Henderson Bartel's apartment; she had only told him where it was located, and she had never implicated Bartel. Nevertheless, Bruce agreed portions of the affidavit concerning the drug transaction itself would be true if they were attributed to her.

Bruce also claimed to have had an affair with Henderson. Henderson denied this allegation and moved to exclude Bruce's testimony relating to it. After performing a balancing test under Federal Rule of Evidence 403, the judge decided the evidence

relating to the affair would not be admitted, but "[i]f something [came] up in the testimony that open[ed] the door for it, [the judge would be] inclined to admit it." (*Id.* at 112.)

On cross-examination, defense counsel challenged Bruce's testimony regarding her frequent contact with Henderson prior to the execution of the search warrant. Counsel asked, "If Jeff Henderson's phone records show that the first call between you and him was two hours [after the search warrant was executed], you would agree that you could not be the RCI on that particular transaction . . .; isn't that correct?" (*Id.* at 148.) Bruce responded, "There's no way that was the only phone call." (*Id.*)

On redirect, the government revisited the contact between Bruce and Henderson:

Q.      And you said there's no way that's the only phone call?

A.      There's absolutely no way.

Q.      Why is that?  Did you have other contact?

A.      We talked nearly every day.  We'd be on the phone, text messages. Some text messages would begin at 8 o'clock in the morning.  Some would be 2 a.m.  We talked regularly.

A.      You were also asked specifically – you said – you indicated that you saw him, Jeff Henderson, quite frequently?

A.      Uh-huh.

Q.      And you were asked the question of every time you saw him, he was working, and you said, no, not every time.  Do you recall that?

A.      Yes, I do.

Q.      In what circumstances would you have seen Jeff Henderson during that time?

A.      We had a sexual relationship.

(*Id*. at 158.)

Defense counsel immediately objected and, at the bench, moved for a mistrial. The judge denied the motion stating, "I don't think it rises to that level . . . . and you did to some extent [broach] the subject about phone calls." (*Id*. at 159). Counsel then moved to strike the answer. The judge agreed and so instructed the jury.

Bartel and Kinnard also testified. According to them, Bruce obtained a pill at their apartment from Bartel. However, no one else had been sold Ecstasy at the apartment in the 72 hours before the search. Kinnard admitted to selling drugs, which he kept at the apartment, but claimed not to have sold drugs at the apartment; he sold them "around town." (*Id*. at 193.) When these witnesses were shown a picture of Rochelle Martin, the person Henderson claimed to be the RCI, both said they did not know her and she had never been in their apartment.

Perhaps the most damaging testimony came from Assistant United States Attorney Stephen Sewell. Sewell testified to having worked on Thomas Neal's case and having prepared a motion for a reduction of Neal's sentence. Sewell became aware of a third party acting on Neal's behalf and whose cooperation led to the search of Bartel's apartment on February 12, 2008. Prior to including that information in his motion to reduce Neal's sentence, Sewell said he would have verified the accuracy of the information by speaking with "law enforcement," by which he meant:

> [I]t would have been somebody within Tulsa Police Department or ATF that would have knowledge of Mr. Neal's cooperation as well as that a third party was cooperating on his behalf, and actually in addition the reason I would be asking is I'm in the process of filing a downward departure.

- 6 -

(Appellant's App'x Vol. 2 at 254-55.) Although he knew the third party was Neal's girlfriend, he could not specifically remember contacting Henderson.

Rochelle Martin also testified for the government. She had been giving Henderson information for ten to eleven years. Even so, she claimed not to know Bartel or Kinnard and denied supplying information about them to Henderson. On several occasions Martin freely admitted she lied in previous court proceedings.

The defense presented the testimony of Yelton, Henderson, and another officer, Frank Khalil. According to Yelton's testimony, Henderson told him Martin was the RCI on the Bartel/Kinnard case. Khalil, who was Henderson's partner from 2005 to 2008, testified he and Henderson met Martin at an agreed-upon location before Henderson prepared and signed the search warrant affidavit. Martin got in Khalil's car and they drove to Bartel's apartment complex where Martin pointed out the entryway to Bartel's apartment. Henderson left the car to find the specific apartment. They then returned Martin to her car and went back to the complex. Henderson checked with the management and determined the apartment belonged to Bartel. Khalil had also conducted surveillance at the apartment and saw a black male (Kinnard) going up the stairs. According to Khalil, the prosecution's witnesses were all lying or mistaken.

Henderson's testimony about the events corroborated Khalil's. During the ride back to Martin's car, Martin told him there was a white woman, whose name she did not know [presumably Bartel] in the apartment with Kinnard. Martin said she had been physically in the apartment and watched Ecstasy being sold. Henderson referred to his cell phone records showing two calls from Martin on February 10 and February 11, 2008.

He testified to having discussed her information and setting the time and place to meet during those calls.

Henderson denied any contact with Bruce before the day of the search. He referred to his phone records to show the first phone call from his phone to Bruce occurred two hours after the search was executed: "The only thing [Bruce] did on this investigation" was "set Carah Bartel up after [he] filed arrest warrants for Carah Bartel and William Kinnard, because they were not present during the search warrant itself." (Appellant's App'x Vol. 7 at 1386-87.) Henderson claimed her story about buying a pill was "completely a lie." (Appellant's App'x Vol. 8 at 1536.)

 B.    Crawford Search Warrant and Testimony (Counts 45, 47, 50, 51, 52, 54, and 55)

On January 6, 2009, Henderson signed an affidavit applying for a warrant to search the residence of Ronald Crawford in Tulsa, Oklahoma. His affidavit gives the same description of the RCI as did the affidavit for the Bartel/Kinnard search. It then reads, in relevant part:

> Your affiant further states in the past 72 hours the mentioned RCI has been to the above described residence and observed a black male, known to the RCI as "Ronald Crawford" who was selling cocaine out of this residence. The RCI directed your affiant to the residence and pointed it out as the residence from which the RCI observed the cocaine within the past 72 hours. The RCI told your affiant that the cocaine was packaged for sale. The RCI told your affiant that the RCI has observed "Ronald Crawford" conduct drug transactions from this residence within the same past 72 hours. The RCI described the cocaine to your affiant and that the RCI is positive that the items seen in the residence were indeed cocaine.
>
> Within the past 72 hours your affiant further states that he and other officers have observed short term vehicular and pedestrian traffic to and from the residence to be searched, which is consistent with the sale of narcotics and other controlled illegal substances. Within the past 72 hours

> your affiant has observed Ronald Crawford coming and going to and from
> the residence.

(Appellant's App'x Vol. 9 at 1667.)  Henderson again testified the RCI was Rochelle Martin.

Although Henderson attempted to execute the warrant on the date it was signed, January 6, 2009, Crawford was not at the residence.  But on the morning of January 12, 2009, officers saw Crawford leaving his driveway; he was stopped and the warrant was executed.  The officers did not find cocaine, but they did find a small bag of marijuana, a revolver, and $7,000 in a plastic baggie under the sink.  Crawford was arrested and charged in federal court with being a felon in possession of a firearm.

Crawford moved to suppress evidence in his federal weapon possession trial based on the veracity of the search warrant affidavit.  He claimed he was not in town on the dates Henderson claimed he saw Crawford during the pre-search surveillance.  The government attorney at Crawford's suppression hearing, Eric Johnston, testified at Henderson's trial about the events during the suppression hearing, conducted pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).[3]  The *Franks* hearing continued through two separate dates.  At both times, Henderson insisted the statements he made in the affidavit were true.[4]  As he explained to the court, he received information from Rochelle Martin

---

[3] "An affidavit does not provide probable cause to support a search warrant if the affiant intentionally or recklessly asserted material falsehoods." *United States v. Lewis*, 594 F.3d 1270, 1286 (10th Cir. 2010) (citing *Franks,* 438 U.S. at 164–65).

[4] Shortly after the first hearing date, the judge requested the parties submit additional evidence.  Before the second hearing date, Henderson contacted Johnston, to

(Continued . . . )

about Ronald Crawford dealing cocaine on January 5, 2009.  He and Yelton then followed up through surveillance at Crawford's residence on January 5 from 1 p.m. to 3:30 p.m. and from 9:30 a.m. to 10:30 a.m. on January 6.  On both days he and Yelton saw short-term traffic about the residence and he personally saw Crawford walk from his white Suburban to go into the home.  In fact, Henderson said he was "positive" he saw Crawford on January 6.  (Appellant's App'x Vol. 9 at 1721.)  At the second hearing date, Yelton corroborated Henderson's testimony.

Crawford's evidence told a contradictory story.  His fiancé, Ranica Crowder, testified to the following:  She and Crawford had moved to Arlington, Texas, in 2008.  One of Crawford's daughters spent Christmas vacation with them and, after the Christmas break, Crawford was in Tulsa to return the child to her mother.  He then returned to Arlington on January 4, 2009.  On January 5, Crowder and Crawford went to a bank in Arlington to sign and have notarized an affidavit of residency so his other daughter, who lived with them, could be enrolled in an Arlington school.  Crowder believed they left the bank at around 8:45 a.m. and went to the school to submit the paperwork.  Because the enrollment was not completed until late in the morning, the school asked them to return the next day.  Crawford returned to the school the next

---

provide a document showing Henderson had actually prepared and printed the search affidavit before 6:30 p.m. on January 5.  According to Henderson, the point of this revelation is that any facts dealing with January 6 were not material to probable cause for the search and were therefore irrelevant to whether the evidence should be suppressed.

morning with his daughter.  Crowder did not know exactly when Crawford again returned to Tulsa, but it was after January 6.

In support of Crowder's testimony, Crawford submitted redacted documents from Tracy Garcia, the bank notary who witnessed the couple's signatures in Arlington on January 5, and a redacted copy of a sign-in sheet from the Arlington elementary school showing Crawford's presence on January 6, 2009.

At one point, the federal trial judge initiated the following colloquy with Henderson:

> Q. And you are absolutely certain, as you sit here right now, that on January 5th at one p.m., the white suburban driven by Mr. Crawford was in his driveway?
> A. Yes.
> Q. And you're absolutely certain, from prior experience with Mr. Crawford, that he was there at that house because you came out and you saw him between one and 3:30 that day?
> A. Correct, yes.
> Q. And everything that is in your affidavit that you prepared that evening is true and correct?
> A. Yes, ma'am.

(*Id.* at 1752.)

The judge denied Crawford's motion to suppress.  She found Henderson's and Yelton's testimony credible and concluded the most likely scenario was:

> Crawford traveled to Tulsa on January 5 after having his signature notarized at the bank in Arlington.  He stayed in Tulsa until [some time] after 10:30 a.m. on January 6, and returned to Arlington and signed in at his daughter's school at 3:50 p.m.

(*Id*. at 1801.)[5] She also concluded that, even if Henderson was mistaken about his January 6 identification of Crawford, the mistake was immaterial because the affidavit was prepared on January 5.

Crawford entered a conditional plea of guilty to the possession of a firearm charge and filed a motion for reconsideration supplemented by a more legible copy of the school exhibit. It showed Crawford was at the school at 7:50 a.m. on January 6, (not 3:50 p.m. as the judge originally thought), and therefore, could not have been in Tulsa by the time Henderson was conducting the surveillance. The judge allowed Crawford to withdraw his guilty plea, granted his unopposed motion for reconsideration, and dismissed the charges.

At Henderson's trial, Crawford testified about two significant matters: 1) he had been in Arlington from Sunday, January 4, until the next Saturday; and 2) Rochelle Martin had never been in his house. The government then called Tracy Garcia, the bank notary in Arlington, Texas. She did not record the exact time she notarized Crawford's signature, but the signature immediately before Crawford's on January 5, 2009, was recorded at 11:03 a.m. Accordingly, she would have notarized Crawford's signature after 11:03 a.m. on that day. Finally, Randi Smith, the school principal at the elementary school in Arlington, also testified. She said she may have seen Crawford on January 5,

---

[5] Henderson testified it takes four hours to drive from Arlington, Texas, to Tulsa, Oklahoma.

but was certain she spoke with him on January 6, 2009, around 7:50 a.m. and then took him to meet his daughter's teacher.

According to the testimony of the Texas witnesses, Henderson could not have seen Crawford in Tulsa on either date listed in his affidavit for the search warrant. Nevertheless, at his trial, Henderson maintained the truthfulness of his earlier account. Both Henderson and Yelton testified to the surveillance of Crawford's residence in detail. Both insisted everything they said at Crawford's suppression hearing was true.

During Henderson's direct examination at his trial, defense counsel requested and received a closed hearing regarding concerns about the activities of a juror. Defense counsel said a friend of that juror attended the trial frequently and took "a lot of notes." (Appellant's App'x Vol. 8 at 1618.) Counsel had seen the friend having lunch with the juror once and possibly "one other time." (*Id*.) He further noted the juror's friend often sat next to and conversed with a man who was known to have claimed credit for opening Henderson's investigation and who had openly spoken against Henderson "on the media and on the Internet and on a blog . . . ." (*Id*. at 1619.) Although defense counsel had not seen the rabble-rouser talk directly to the juror, counsel expressed concern the man was using the juror's friend as "a back channel to the juror." (*Id*. at 1620.) Counsel continued: "I don't know that anything improper has happened but it's a rare occasion that a juror has a friend who comes to court every day and takes notes and then has contact with somebody who clearly has at least a political interest in this case . . . ." (*Id*.) The judge ruled:

> [B]ased on what I've heard, and it is not unusual in my experience to have a

- 13 -

spouse or a friend watch all or parts of the trial. I don't know what their relationship is but I've not heard anything that would suggest that there's been communication that violates my admonitions. So unless there's something more, I'm not inclined to inquire and single out [the juror.]

(*Id*. at 1622.) The defense rested after Henderson completed his testimony.

The government called a rebuttal witness, Andrew Kerstetter, a special agent with the FBI in Oklahoma. Kerstetter was asked whether he had "extensive training in cellular telephone analysis and geolocation training." (*Id*. at 1593-94.) At that point, Henderson's counsel asked to approach the bench, saying:

It sounds as though the government is attempting to produce an expert witness. They specifically told the court at a pretrial motion hearing that there would be no expert witnesses, and we had requested reports of expert witnesses and they produced none . . . and now they're trying to produce additional testimony even thought we were given no notice.

(*Id*. at 1594.) The judge responded:

It sounds like it's going to be about the phone records, which is what the basis of [Henderson's] questioning was. I don't think its expert testimony, but you can have him testify about the phone records.

(*Id*.)

Through Kerstetter's testimony, the government demonstrated Henderson's cell phone records during the time of his asserted surveillance revealed Henderson not to be in the vicinity of Crawford's house. Kerstetter relied on three exhibits. Two were excerpts from Henderson's proposed exhibits showing his cell phone records on the dates he claimed to be conducting the Crawford surveillance (Exhibit 49-b) and the date he

executed the Crawford search warrant (Exhibit 49-c). S*ee* Attachment 1.[6] Henderson did not object to the admission of the exhibits.

Kerstetter first explained the significance of each column of numbers in Henderson's cell phone records—the phone call's date, time, length, the originating number, the dialed digits, the originating cell tower and the cell tower used to terminate the call. The prosecutor again asked Kerstetter if he "had training in cellular telephone analysis" and "geolocation training." (*Id*. at 1597.) Kerstetter answered, "yes" (*id.*); Henderson did not object. Kerstetter then explained: the originating cell tower is the tower communicating with (serving) the calling cell phone and the terminating cell tower is the one serving the receiving cell phone (one tower might serve both cell phones). Looking at the specific calls on January 5, 2009, between 1 p.m. and 3 p.m. (the date and time range when Henderson claimed to have seen Crawford at his house), Kerstetter noted Henderson's cell phone made and received calls from cell tower 466, sector 3. On January 6, 2009, between 9:30 a.m. and 10:30 a.m. (the date and time range when Henderson allegedly conducted his second day of surveillance), Henderson's phone used two cell towers, tower 408, sector 2, and cell tower 400, sector 2. When Henderson was known to be at the Crawford's residence on January 12, 2009 (because he was executing

---

[6] Exhibit 49-b consists of two pages showing Henderson's cell phone records on the dates of "01/02/2009" to "01/07/2009." Exhibit 49-c consists of two pages showing his cell phone records on the dates of "01/09/2009" to "01/13/2009." Attachment 1 is for illustrative purposes. It consists of only one page from Exhibit 49-b.

the search of Crawford's house), all his calls used a different cell tower—tower 441, sector 2. The import of this information was explained by Kerstetter's next exhibit.

The third exhibit, Exhibit 49-a, to which Henderson affirmatively said he had no objection, was a map of the Tulsa area showing the locations of the various cell towers in the area. The range of each relevant sector of each relevant tower's antennas is shaded in color.[7] The map also displayed the location of Crawford's house. *See* Attachment 2. The house was situated almost directly under tower 441. According to the map, Crawford's house was not within the range of the cell towers listed as having had cell phone traffic from Henderson's phone during the relevant times on January 5 or 6. From the three exhibits Kerstetter concluded Henderson's cell phone calls during the alleged surveillance were not made or received near Crawford's house.

Following the jury's verdict, Henderson moved for a new trial on all counts of conviction and for an acquittal on the civil rights counts due to insufficient evidence.[8] Attached to the motion Henderson submitted a juror's affidavit stating the juror had a change of heart after voting for a guilty verdict on the perjury counts. When the juror told the rest of the jury members of the changed decision, the foreman said the form on

---

[7] Cell phone towers typically have multiple antennas, each serving a sector (usually 120 degrees) of the 360 degrees comprising the circle around the tower. See, for instance, www.unisonsite.com/pdf/resource-center/How%20Towers%20Work.pdf.

[8] He does not argue sufficiency of the evidence on appeal. His brief merely includes a conclusory statement claiming the evidence was insufficient given the jury's disbelief of Martin's testimony on all but two of the civil rights counts. (Appellant's Opening Br. at 23-24.)

those charges had been signed and could not be changed.  The next day, after completing deliberations, the jury returned to the courtroom with the verdicts.  Although each juror was polled and each verified his or her agreement with the verdict, the juror claimed she misunderstood the question at polling and, but for the misunderstanding, would have answered differently.  The government moved to strike the affidavit pursuant to Rule 606(b) which prohibits a juror from testifying about deliberations.  Although the judge did not strike the affidavit, he refused to consider it and denied the motion for a new trial.

On appeal, Henderson claims:  (1) the judge erred in admitting Kerstetter's expert testimony in rebuttal to his defense, (2) the prosecutor's improper solicitation of testimony regarding the alleged affair with Bruce denied him a fair trial, (3) the judge failed to fully investigate his allegations of a possible external influence on a juror during trial, and (4) his right to a unanimous verdict was compromised because a juror was misled into believing she could not retract her guilty vote.

**DISCUSSION**

A.  <u>Kerstetter's Testimony</u>

Henderson challenges Kerstetter's testimony for several reasons.  At trial, he objected because he had received no notice of the government's intention to present an expert on rebuttal.  But, in his motion for a new trial, he claimed Kerstetter's opinion testimony exceeded the permissible scope of rebuttal and should not have been admitted without first considering his expert qualifications and the reliability of his methods.

1.    Standard of Review

Because Henderson's trial objection to Kerstetter's testimony rested solely on lack of notice, the government contends we must apply plain error review to his additional challenges. Henderson sees it differently: (1) The government's question regarding Kerstetter's qualifications was the basis for his limited objection; (2) Due to the judge's ruling that the testimony was not expert testimony, any further objection was "pre-empted"; (3) Therefore, the plain error rule is inapplicable. (Appellant's Opening Br. at 44.) We agree with the government.

To preserve an objection based on the admissibility of expert testimony, the precise basis for the objection must be adequately raised. *See United States v. Avitia-Guillen*, 680 F.3d 1253, 1257 (10th Cir. 2012) ("Where a party objects only to an expert's qualifications, he does not preserve an objection to the expert's methodology."), *cert. denied*, 133 S. Ct. 466 (2012); *Macsenti v. Becker*, 237 F.3d 1223, 1232 (10th Cir. 2001) ("[A] decision to admit expert opinion evidence will be reviewed only for plain error when objections under *Daubert/Kumho*[9] are not timely made."). Even though he had numerous opportunities to do so as Kerstetter's testimony unfolded, Henderson did not challenge the district court's previous ruling, Kerstetter's reliability, or his methodology. Nor did he request a continuance to prepare for Kerstetter's cross-examination. It is not enough that he raised his additional objections in his new trial

---

[9] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

- 18 -

motion.  *See United States v. Hill*, 60 F.3d 672, 675 (10th Cir. 1995) (stating objection in motion for new trial "does not make up for the failure to object when the evidence was proffered at trial").

Consequently, we review all claims other than adequate notice under our plain error standard.  *Id*.  Plain error occurs "only when four requirements are met:  (1) an error occurred; (2) the error is plain or obvious; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Pablo*, 696 F.3d 1280, 1287 (10th Cir. 2012).

2.      Whether Kerstetter Testified as an Expert

"When the subject matter of proffered testimony constitutes 'scientific, technical, or other specialized knowledge,' the witness must be qualified as an expert under Rule 702."  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir.2004) (quoting Fed. R. Evid. 702).  Henderson argues the judge "failed to exercise his gate-keeping role by finding . . . [Kerstetter's] testimony was admissible without requiring him to be qualified and without determining if the subject of the testimony is reliable." (Appellant's Opening Br. at 44.)  The question becomes whether Kerstetter testified as an expert, and if so, at what point in his testimony did he do so.

"The distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field."  *United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011) (citing and quoting Fed. R. Evid. 701 advisory committee notes (2000 amend.)).  As the judge ruled,

testimony limited to "the phone records," generally would not be expert testimony. And for the most part, his ruling on the nature of Kerstetter's testimony was correct; the majority of his statements required nothing more than knowing the meaning of abbreviations. The bulk of Kerstetter's testimony was, just as the judge predicted, a non-expert's recitation of business records. *See LifeWise Master Funding*, 374 F.3d at 929 ("[A] person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person.").

Henderson thinks Kerstetter's opinion on the actual location of Henderson's telephone based on the map of the cell tower locations crossed the line. Close examination does not support his position. After showing Kerstetter the tower locations map, the prosecutor asked what might well be an improper question of a lay witness: "[W]hoever was using the phone number 277-3007 [Henderson's phone number] on January 5th and 6th was not near this residence of 3631 South Phoenix [Crawford's residence]; is that correct?" (Appellant's App'x Vol. 8 at 1610.) While Kerstetter responded, "Yes, sir," he qualified his statement by saying, "they did not make any phone calls in that sector of that tower." (*Id.*) His qualified answer, to the extent he was merely saying what appeared in the admitted exhibits, was not an expert opinion.[10]

In *Yeley-Davis*, we held an agent gave expert testimony when he described how cell phone towers operate. 632 F.3d at 684. There, his testimony was used to explain an

---

[10] Kerstetter's answer merely reflected the collated call information (including tower and sector) contained in other exhibits (also admitted without objection) with the spatial information contained in 49-a.

apparent discrepancy found in cell phone records between the defendant's phone number and a co-conspirator's number which included an unexplained phone call to a third number. The expert said the third number was nevertheless the co-conspirator's phone number. He explained:

> when you're using your cell phone and you travel outside of your assigned area and you travel onto another tower that's some distance away from your assigned area where you signed up for your phone, it actually through that tower assigns a new phone number for switching purposes to get to your phone.

*Id.* at 683-84 (quotation marks omitted). We reversed the trial judge's decision to allow the testimony over the defendant's objection that the agent was not qualified as an expert. *Id*. at 684. We concluded "the agent's testimony concerning *how cell phone towers operate* constituted expert testimony because it involved specialized knowledge not readily accessible to any ordinary person." *Id*. (emphasis added). Nevertheless, we found the error harmless.

Here, however, Kerstetter's testimony did not require such expertise. His testimony was more similar to the testimony in *United States v. Feliciano*, 300 Fed. App'x 795, 801 (11th Cir. 2008).[11] In *Feliciano*, the Eleventh Circuit reasoned:

> [T]he purpose of Detective Christie's cross-examination testimony concerning the location of cellular towers simply was to establish that Manny Ortega's cellular telephone's call to Ortega following Ortega's arrest did not originate at a point near the arrest location. Detective Christie

---

[11] An unpublished opinion from another Circuit, *Feliciano*, is not binding precedent. We consider it because of its reasoned analysis.

did not express an expert opinion based on scientific, technical, or other specialized knowledge, as required under Fed. R. Evid. 702. Instead, he simply reviewed the cellular telephone records and a summary of those calls, which identified cellular towers for each call, and based on his personal knowledge concerning the locations of certain cellular towers, testified that, at the time of the call, Manny Ortega's cellular telephone was nowhere near the arrest location. Thus, because the testimony was properly admitted under Fed. R. Evid. 602 and Fed. R. Evid. 701, and did not constitute expert testimony under Fed. R. Evid. 702, the district court did not abuse its discretion in allowing Detective Christie to testify about the cellular tower locations.

*Id*.

Unlike *Yeley-Davis*, there was no discrepancy in Henderson's cell phone records needing expert explanation. Moreover, Henderson affirmatively stated he had no objection to the admission of Kerstetter's tower location map. Thus, any objection to this exhibit has been waived. *See United States Cornelius*, 696 F.3d 1307, 1319 (10th Cir. 2012) ("'A waived claim or defense is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve.'" (quoting *Wood v. Milyard,* ⸺ U.S. ⸺, 132 S. Ct. 1826, 1832 n. 4 (2012)). The judge's admission of this evidence without determining whether it qualified under Rule 702 was not error, let alone plain error.

3.    Whether the Testimony was Proper Rebuttal Evidence

Henderson argues Kerstetter's testimony was not proper rebuttal evidence because Henderson did not rely on his cell phone records when testifying about the surveillance on Crawford's residence. Instead, he based his testimony on his independent recollection of the surveillance. Because "rebuttal evidence is evidence which attempts to disprove or contradict the evidence to which it is contrasted," Henderson maintains Kerstetter's

reliance on cell phone records did not rebut Henderson's recollection. *Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005) (quotation marks omitted).

True, "[r]ebuttal evidence is not any evidence an aggrieved litigant may wish to admit in response to a topic introduced by his opponent." *Id*. The admissibility of rebuttal evidence "depends on whether the initial proof might affect the case and whether the rebuttal evidence fairly meets the initial proof." *Id*. (quotation marks omitted). The testimony revealed Henderson conducted surveillance at Crawford's house from approximately 1 p.m. to 3:30 p.m. on January 5, 2009. He said he saw Crawford leave the home and go to his car for a short period at around 2:00 p.m. on that day and saw three or four cars stop in front of the house. Black males went into the house for short periods of time before exiting and driving away. On January 6, from about 9:00 a.m. to 10:30 a.m., Henderson again saw Crawford at the residence and "short-term traffic." He repeatedly denied he had fabricated the information provided in his affidavit supporting the search warrant or that he had lied to the court.

The locations of the cell towers which transmitted phone calls to and from Henderson's cell phone directly contradicted the evidence regarding Henderson's surveillance activity. It called into question his location during the time he allegedly saw conduct indicating criminal activity. The anomaly in the cell phone records may be explicable, but Henderson did not seek leave to explain during the trial[12] and did not see

---

[12] He could have, for instance, sought to introduce surrebuttal evidence to explain why his cell phone was connecting to a distant tower, rather than one closer to his alleged

(Continued . . . )

fit to include in his post-trial motions expert testimony, or an affidavit, challenging the seemingly common sense matters about which Kerstetter testified.[13] In sum, Kerstetter's testimony fairly met and contradicted Henderson's testimony that he was at the Crawford house at specific dates and times. Again, there was no error, let alone plain error.

4. Notice

Henderson claims the government should have been required to produce the rebuttal exhibits (the phone records and the map) and/or a summary of Kerstetter's testimony before trial. While he recognizes there is no general duty to produce documents that may be offered solely as rebuttal evidence, he maintains this evidence was material to his preparation of a defense.

_____

location. Perhaps he had temporarily moved to a different location (in which event his surveillance was not continuous); perhaps someone else had his phone for part of the time; or perhaps atmospheric or other conditions caused the phone to connect to a distant tower. But those possibilities beg even more questions. For instance, with respect to the latter, any explanation would have to also explain why Henderson's phone connected to Owasso 400, sector 2 (a SE facing sector) rather than sector 3 (a NW facing sector, one facing in the direction of the Crawford residence, rather than away from it).

[13] One of the hallmarks of expert testimony is its usefulness in dispelling commonly held misperceptions through the use of scientific or other specialized knowledge. For instance, one might look to the debate about experts who opine on the reliability of eyewitness testimony. *See United States v. Rodriguez-Felix*, 450 F.3d 1117, 1124 (10th Cir. 2006) (observing circumstances involving "such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and such psychological phenomena as the feedback factor and unconscious transference" have justified the use of expert testimony) (quotation marks omitted). Henderson's real issue here is not whether Kerstetter's testimony amounted to expert opinion, but whether truly expert opinion was necessary to dispel inaccurate, misplaced or overstated portions of his testimony. Henderson produced no such evidence.

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure requires the government to disclose:

> **(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> (i) the item is material to preparing the defense.[14]

Rule 16 requires Henderson to show he requested the information, he was denied access, and it was material to his defense. Rebuttal evidence is material to the defense "if it could be used to counter the government's case or to bolster a defense," and is not "deemed material merely because it would have dissuaded the defendant from proffering easily impeached testimony." *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993) (quoted with approval in *United States v. Card*, 46 Fed. App'x 941, 945 (10th Cir. 2002) (unpublished)).[15]

---

[14] We easily dispose of Henderson's arguments based on the government's failure to provide a summary of Kerstetter's expert testimony under Rule 16(a)(1)(G). The rule does not apply because there is no duty to provide a summary of expert rebuttal testimony. *See United States v. Frazier*, 387 F.3d 1244, 1268 (11th Cir. 2004) ("[C]onsistent with the plain language of the Rule, the government's presentation of *rebuttal* testimony without prior notice does not violate Rule 16, since the Rule's notice requirements apply only to the government's case-in-chief."). Moreover, Rule 16 requires the government to provide documents within its possession; it does not require the government to prepare documents. *See* Fed. R. Crim. P. 16(a)(1)(G).

[15] Our unpublished opinions are not binding precedent. 10th Cir. R. App. P. 32.1(A). We mention *Card* because of its reasoned and persuasive analysis.

According to Henderson, had the defense been given notice of the government's exhibits on which Kerstetter's testimony was based, his counsel could have carefully examined the records and shown there were instances when several different cell towers were utilized while Henderson was in a stationary location. Therefore, the rebuttal exhibits could have been used to counter the government's case or to bolster his defense. Henderson fails to acknowledge that, excepting Kerstetter's map to which there was no objection, he had the information he now claims the prosecution should have provided long before trial – it was taken from his own exhibit. What Henderson is actually complaining about is his lack of notice that he would be impeached with his own records. This is not a Rule 16 violation. The district judge did not err in admitting Kerstetter's exhibits.

B.     Prosecutorial Misconduct/Bruce's Cross-Examination

Henderson claims the judge erred in denying his motion for a mistrial and he was entitled to a new trial because the jury was unduly prejudiced when the prosecutor deliberately elicited testimony from Bruce about the affair she claimed to have had with Henderson. "When defense counsel contemporaneously objects to alleged prosecutorial misconduct at trial and moves for a mistrial, we review a district court's decision to deny his motion for abuse of discretion." *United States v. Apperson*, 441 F.3d 1162, 1207 (10th Cir. 2006) (quotation marks omitted). We apply a two-part test; first determining "whether the conduct was improper," and if so, "whether the prosecutor's conduct affected the fairness of the trial." *Id.* (quotation marks omitted).

The district judge determined:

> [C]ounsel for the Government did not engage in misconduct by asking the question that led to Ms. Bruce's one-sentence statement. . . . [T]he Court understands why counsel could have believed in good faith that the door had been opened. Defense counsel engaged in cross-examination of Ms. Bruce, attempting to undermine her testimony that she and [Henderson] communicated often during the period in question. It is a close call whether this line of questioning opened the door to rebuttal testimony that might, if believed, explain why there was so much communication between Ms. Bruce and [Henderson]. Making such a judgment call during the heat of trial, even if the judgment call is rejected by the presiding judge, does not rise to the level of misconduct.

(Appellant's App'x Vol. 11 at 2186 (citation omitted).) The judge also concluded that even assuming prosecutorial misconduct occurred, a new trial was not warranted: the jury was instructed to disregard the answer; Bruce's statement was one sentence during a three-week trial; and the statement obviously did not influence the jury against Henderson because he was acquitted of the vast majority of the charges against him. (*Id*.)

We agree with this analysis. *See Polson v Davis,* 895 F. 2d 705, 711 (10th Cir. 1990) (noting that because appellate review of egregiousness of misconduct "is constrained by our ability to review only the written record . . ., we give great deference to the district judge who observed the trial"). Like the district judge, we are not persuaded the exchange between the prosecutor and Bruce was the result of deliberate misconduct. Moreover, the denial of Henderson's motion for a mistrial was immediately followed by a curative instruction directing the jury to disregard the answer. That the jury would be able to do so is "a determination that the district court is in a better position to make than we are." *Roberts v. Roadway Express*, *Inc.*, 149 F.3d 1098, 1106 (10th Cir. 1998). Nothing in the record supports an inference that Bruce's single statement about an

alleged affair infected the verdict. Henderson was not denied a fair trial; his motions for a mistrial and/or a new trial were properly denied.

C.     External Influence on Juror

Toward the end of the trial, defense counsel requested and received a closed hearing regarding his concerns about the activities of a juror. Henderson claims the district court erred because it failed to fully investigate his concerns. He relies on the Supreme Court decision in *Remmer v. United States*, 347 U.S. 227 (1954), where the Court stated: "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about a matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . ." *Id.* at 229. In *United States v. Brooks*, however, we held "the mere fact of a juror conversing with a third-party does not raise the *Remmer* presumption. 161 F.3d 1240, 1246 (10th Cir. 1998). "Instead, the presumption arises only when there has been a communication or contact about the matter pending before the jury." *Id*. (quotation marks omitted).

Assuming, generously, that defense counsel's expression of concerns amounted to a request for an investigation, there is no evidence here of any communication with the juror about the matter pending before the jury. A juror had lunch with a trial spectator. The same spectator was seen speaking with a man on several occasions because they were seated near each other during the trial. There is no evidence the man was aware of any connection between the spectator and the juror; we have only defense counsel's suspicions. A *Remmer* hearing is not required when it is based on "ordinary incidental contacts between non-sequestered jurors and virtually any other person during the course

- 28 -

of a trial." *Id.* Moreover, Henderson brought nothing to the attention of the judge which would reasonably cause a concern that the juror's friend initiated inappropriate contact with the juror. The judge had instructed the jurors not to discuss the case and we presume the juror followed this instruction. *Banks v. Workman*, 692 F.3d 1133, 1150 (10th Cir. 2012), *cert. denied*, 133 S. Ct. 2397 (2013). The judge did not err in failing to take the matter further.

D.  Juror Mistake

Henderson's final argument for a new trial was based on the juror affidavit attached to his motion. He claims he was denied his constitutional right to a unanimous jury when the judge denied his motion for a new trial based on juror mistake.

Rule 606(b) of the Federal Rules of Evidence provides:

**(1) Prohibited Testimony or Other Evidence.** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Although Rule 606(b)(2) allows several exceptions to this provision, Henderson does not argue any of the exceptions apply. Instead, he contends the jury may have improperly considered the charges and the foreman gave the juror erroneous legal advice preventing the juror from changing his/her verdict. However, he concedes each juror was polled before the verdict was entered and agreed the verdict was correct.

As explained in detail in *United States v. Benally*, the purpose of Rule 606(b) goes beyond the factual considerations of an individual case. 546 F.3d 1230, 1233 (10th Cir.

2008) ("If what went on in the jury room were judicially reviewable for reasonableness or fairness, trials would no longer truly be by jury, as the Constitution commands."). Application of the Rule has been upheld even in the face of potential Constitutional error. *Id*. at 1239 ("This Court . . . has consistently upheld application of the Rule 606(b) standards of exclusion of juror testimony even in the face of Sixth Amendment fair jury arguments.") (quotation marks omitted). We must adhere to the Rule as it is written. *Id*. ("Courts no longer have common law authority to fashion and refashion rules of evidence as the justice of the case seems to demand, but must enforce the rules as enacted."). There was no error in refusing to consider the juror's affidavit.

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge



| Start Date | Connect Time | Duration (Sec) | Orig Number | Dialed Digits | Called Number | Call Type | AN | 3W | CW | CF | MS | Orig CLLI | Term CLLI | Switch |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/02/2009 | 16:54:30 | 000090 | 9182773007 | 5962801 | 9185962801 | M-L | Y | N | N | N | N | 4422 | 0071 | owas |
| 01/02/2009 | 16:56:11 | 000095 | 9182773007 | 6056229 | 9186056229 | M-L | Y | N | N | N | N | 41c1 | 0402 | owas |
| 01/02/2009 | 17:50:07 | 000005 | 9182710217 | 9182773007 | 9182773007 | L-L | Y | N | N | N | N | 0402 | 0187 | owas |
| 01/02/2009 | 18:05:07 | 000005 | 9184250886 | 9182773007 | 9182773007 | L-L | Y | N | N | N | N | 0085 | 0187 | owas |
| 01/02/2009 | 18:05:51 | 000004 | 2149125945 | 9182773007 | 9182773007 | L-L | Y | N | N | N | N | 0085 | 0187 | owas |
| 01/02/2009 | 19:55:56 | 000018 | 9182773007 | 8302164 | 9188302164 | M-L | Y | N | N | N | N | 0085 | 4bb3 | owas |
| 01/02/2009 | 19:56:46 | 000009 | 9182710217 | 9182773007 | 9182710217 | M-L | Y | N | N | N | N | 5112 | 0402 | owas |
| 01/02/2009 | 19:58:04 | 000086 | 9182773007 | 8302164 | 9183717677 | M-L | Y | N | N | N | N | 5112 | 0402 | owas |
| 01/02/2009 | 20:19:48 | 000152 | 9188302164 | 9182773007 | 9188302164 | L-M | Y | N | N | N | N | 5112 | 5112 | owas |
| 01/02/2009 | 21:42:28 | 000025 | 9183717677 | 9182773007 | 9182773007 | L-L | Y | N | N | N | N | 0085 | 0187 | owas |
| 01/04/2009 | 18:56:47 | 000002 | 9182878943 | 9182773007 | 9182773007 | L-L | Y | N | N | N | N | 0085 | 0187 | owas |
| 01/04/2009 | 22:22:33 | 000017 | 9182710217 | 9182710217 | 9182710217 | M-L | Y | N | N | N | N | 5112 | 0187 | owas |
| 01/04/2009 | 22:31:56 | 000025 | 9182710217 | 9182773007 | 9182773007 | M-L | Y | N | N | N | N | 0124 | 5112 | owas |
| 01/04/2009 | 22:39:32 | 000090 | 9182845766 | 9182773007 | 9182845766 | L-L | Y | N | N | N | N | 0187 | 0187 | owas |
| 01/04/2009 | 08:17:08 | 000023 | 9182845766 | 9182773007 | 9182773007 | L-L | Y | N | N | N | N | 0085 | 44b3 | owas |
| 01/05/2009 | 08:24:03 | 000274 | 9182773007 | 9182773007 | 9182773007 | L-L | Y | N | N | N | N | 5111 | 0402 | owas |
| 01/05/2009 | 10:02:41 | 000009 | 9183717677 | 3717677 | 9183717677 | M-L | Y | N | N | N | N | 0187 | 0187 | owas |
| 01/05/2009 | 11:23:19 | 000177 | 9182773007 | 9182773007 | 9182773007 | M-L | Y | N | N | N | N | 45c2 | 0071 | owas |
| 01/05/2009 | 11:30:38 | 000034 | 9182773007 | 9182773007 | 9182773007 | M-L | Y | N | N | N | N | 4433 | 0187 | owas |
| 01/05/2009 | 11:36:24 | 000279 | 9188512422 | 9182773007 | 9182773007 | L-M | Y | N | N | N | N | 0124 | 5112 | owas |
| 01/05/2009 | 11:41:41 | 000091 | 3717677 | 3717677 | 9183717677 | M-L | Y | N | N | N | N | 5111 | 0402 | owas |
| 01/05/2009 | 12:12:40 | 000115 | 9185969146 | 5969146 | 9185969146 | M-L | Y | N | N | N | N | 0085 | 0187 | owas |
| 01/05/2009 | 12:30:36 | 000097 | 9182715026 | 9182715026 | 9182715026 | L-L | Y | N | N | N | N | 4663 | 0187 | owas |
| 01/05/2009 | 12:32:41 | 000010 | 9182773007 | 9182773007 | 9182773007 | L-M | Y | N | N | N | N | 0085 | 4663 | owas |
| 01/05/2009 | 13:16:41 | 000041 | 9186077453 | 9182773007 | 9182773007 | L-L | Y | N | N | N | N | 4663 | 0187 | owas |
| 01/05/2009 | 13:23:09 | 000028 | 9187063009 | 9182773007 | 9182773007 | L-L | N | N | N | N | N | 0085 | 0187 | owas |
| 01/05/2009 | 14:03:17 | 000063 | 9182773007 | 9182715026 | 9182715026 | M-L | Y | N | N | N | N | 0085 | 0187 | owas |
| 01/05/2009 | 14:04:44 | 000031 | 9182773007 | 9182773007 | 9182773007 | M-L | Y | N | N | N | N | 4663 | 0187 | owas |
| 01/05/2009 | 14:16:44 | 000182 | 9187063009 | 9182773007 | 9182773007 | L-L | Y | N | N | N | N | 0085 | 4663 | owas |
| 01/05/2009 | 14:20:13 | 000007 | 9182773007 | 5961389 | 9185961389 | M-L | Y | N | N | N | N | 0085 | 0071 | owas |
| 01/05/2009 | 14:22:56 | 000046 | 9182772996 | 2773007 | 9182773007 | M-M | Y | N | N | N | N | 4bb2 | 4663 | owas |
| 01/05/2009 | 15:15:53 | 000102 | 9184250886 | 9182773007 | 9182773007 | L-M | N | N | N | N | N | 0085 | 3e91 | owas |
| 01/05/2009 | 15:26:11 | 000042 | 2149125945 | 9182773007 | 9182773007 | L-M | Y | N | N | N | N | 0085 | 3e93 | owas |
| 01/05/2009 | 15:56:21 |  | 9182773007 | 2149125945 | 2149125945 | M-L | N | N | N | N | N | 0053 | 3e93 | owas |
| 01/05/2009 | 16:13:38 | 000061 | 9184250886 | 9182773007 | 9182773007 | L-M | N | N | N | N | N | 3e93 | 4592 | owas |

GOVERNMENT EXHIBIT 419-b

ENGAD 800-631-6989

Attachment 1

Aple.App.No.01183

(918)277-3007

Osage Indian Reservation

Owasso 3E9
36.20722, -95.99389
Sector 1 - 30 degrees

Owasso 3E9
36.20722, -95.99389
Sector 3 - 270 degrees

Owasso 441
36.11056, -96.00806
Sector 2 - 150 degrees

RESIDENCE
3631 S Phoenix Ave W
Tulsa, OK 74107

Owasso 400
36.08556, -95.94083
Sector 2 - 150 degrees

Owasso 466
36.15142, -95.99261
Sector 3 - 270 degrees

Owasso 408
36.08722, -95.9225
Sector 2 - 150 degrees

Copyright © and (P) 1988-2007 Microsoft Corporation and/or its suppliers. All rights reserved.

Attachment 2



GOVERNMENT EXHIBIT 49-a
PENGAD 800-631-6989

Aple.App.No.01182